TODD SHIPYARDS, INC. and Travelers
Insurance Co., Petitioners,

v.

David FRALEY and Director, Office of
Workers' Compensation Programs, U.
S. Dept. of Labor, Respondents.

No. 78–1369.

United States Court of Appeals,
Fifth Circuit.

April 2, 1979.

Rehearing Denied June 1, 1979.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Broders, Robert B. Bieck, Jr., New Orleans, La., for petitioners.

J. Wensles Parra, Jr., New Orleans, La., for Fraley.

Gilbert Renaut, Ronald E. Meisburg, U. S. Dept. of Labor, Washington, D. C., for respondents.

Benefits Review Board, Washington, D. C., for other interested party.

Before WISDOM, COLEMAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

This appeal is concerned with David Fraley's claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* The Administrative Law Judge found as a fact that the claimant's diplopia (double vision) was caused by an accident which indisputably occurred. The Benefits Review Board ultimately concluded that claimant was entitled to compensation after the cessation of the physical disability allegedly caused by the accident. We must determine (1) whether the factual findings are supported by substantial evidence on the record considered as a whole and (2) whether the Board's conclusions as to the extended benefits are correct.

Any type of ocular imbalance causes diplopia, for the reason that images then fall on disparate or non-corresponding parts of the two retinas. After a time, however, the patient learns to suppress the image of one eye. This almost invariably happens early in comcomitant strabismus of congenital nature, and the individual grows up with a weak eye (amyblopia ex anopsia).

Principles of Internal Medicine, Harrison, Ed., Fifth Edition, 1966.

When Mr. Fraley was examined by Dr. Azar on April 26, 1973, he was found to have a visual acuity of 20/80 in the right eye and 20/50 in the left eye. He was nearly six times as farsighted in his right eye and approximately three times as farsighted in his left eye as the average person of his age.

We find the record in this case, as well as the findings of the Administrative Law Judge, inadequate for meaningful review. The case will be remanded for further proceedings as hereinafter set forth.

We reverse the award of benefits subsequent to January 31, 1975.

During his 18 years with Todd Shipyards, the claimant had suffered on-the-job injuries such as a broken arm, a broken leg, a hernia, and a foreign object in his eye, all of which received prompt and adequate care. The present problem began on June 27, 1972, when the scaffolding on which he was performing his duties as a machinist at Todd's Mississippi River shipyard broke, and Fraley fell about 15 feet, landing on his back. He was not rendered unconscious but sustained multiple contusions to the body, lacerations of the scalp, and a compression fracture of the fifth thoracic vertebra. The fracture was discovered by X-ray the day after the accident. Prior to that discovery, the hospital doctor had suggested that Fraley was able to return to work. He was fitted with a brace, which he wore for some three months. During this recuperative period, lasting until September 24, 1972, Fraley received temporary total disability payments.

Fraley then returned to his job at the shipyard, but he complained of numbness in his face, headaches and dizziness. He went to see his own doctor, Dr. Isaacson, about these problems and was referred to Dr. K. E. Vogel, a neurosurgeon. The report of

Dr. Vogel, describing his evaluation of December 16, 1972, makes no mention of any complaint by Mr. Fraley that he was then suffering from double vision. Instead, the complaint was that he was occasionally experiencing headache and non-whirling vertigo, along with numbness in the back of his head on the right side (right occipital region). Dr. Vogel concluded that Fraley suffered only from parasthesis secondary to a superficial scalp contusion. He did not think that Fraley would suffer any permanent disability.

Dr. Isaacson did not testify, but the report addressed to him by Dr. Vogel stated that Fraley had been referred to him "for evaluation of numbness in the right occipital region". There was no mention of double vision and this facet of the case stands undisputed. Consequently, insofar as this record is concerned, it must be accepted that when Mr. Fraley went to his own doctor and to Dr. Vogel about six months after the accident he raised no complaint about double vision.

Eight months after the accident, on March 5, 1973, Fraley went to his optometrist, Dr. Hindelang, who found that he had diplopia, i. e., double vision. The optometrist prescribed a lens change and thought that the problem would cure itself. He recommended that Fraley not work above ground as long as the double vision persisted. Dr. Hindelang further testified that he had examined Fraley three or four times since 1967 and that before the accident Fraley had never complained of double vision. However, *on cross examination* (p. 27, Administrative Law Judge transcript), this occurred:

Q. Dr. Hinderberg [sic], you stated that Mr. Fraley had seen you prior to this accident; is that correct?
A. Many times. Let's say 2, or 3, or 4 times.
Q. Yes.
A. I can't exactly pin point it.
Q. For what purpose did Mr. Fraley see you?
A. For correction of eyes with glasses, with lenses.

Q. Okay.
Now, when you examined his eyes what condition did you find needed to be corrected?
A. He had *a little diplopia*, farsightness, and astigmatism in both eyes (emphasis added).

While it is possible that Dr. Hindelang could have intended this statement to apply to what he found in the examination of March 5, 1973, the inescapable fact remains that he was not being questioned about that subject. He was being interrogated about what happened prior to the accident. If anybody present thought that this testimony was ambiguous or might be intended to apply to the examination of 1973 they asked not a single clarifying question. Consequently, we find no warrant in the record for interpreting, or transposing, this testimony so as to have it apply to anything but the pre-accident examinations taking place after 1967.

Dr. Hindelang, as an optometrist, was not expertly qualified to express an opinion as to whether the accident of June 27, 1972, caused or contributed to the diplopia observed on March 5, 1973.

Dr. Robert Azar was an ophthalmologist, a graduate of Tulane University in medicine and a graduate of Loyola University in law. He was a professor at the Tulane Medical School, where he taught a course in muscular balance in the eye.

At the request of the insurance carrier, Dr. Azar examined Mr. Fraley on April 26, 1973, about ten months after the accident. He filed a detailed written report, in which he noted that Mr. Fraley had been injured in an accident on June 27, 1972, by falling from a scaffold and that he had suffered a compression fracture of the fifth thoracic vertebra. He noted that Mr. Fraley was complaining that he now "sees double and can't walk". Without copying the report into the body of this opinion, Dr. Azar said that "I found no visual disability that one might attribute to the type of injuries allegedly sustained by this patient in June 1972." The report did not say whether Mr.

Fraley suffered from double vision, but did say that "He requires no specific eye care other than routine periodic eye examinations recommended for all patients over forty years of age."

Dr. Richard W. Levy, a neurosurgeon, examined Mr. Fraley in his office on May 2, 1973. At that time Fraley was complaining of double vision. X-rays revealed no evidence of injury or disease of the skull. Dr. Levy did not recommend any other neurological diagnostic studies and stated that no neurosurgery was indicated. He thought that Fraley could return to his usual and customary occupation.

Dr. Albert F. W. Habeeb examined Fraley on June 5, 1974, nearly two years after the accident. Dr. Habeeb thought that the double vision was explainable by a partial paralysis in the function of the left superior rectus muscle. He thought that Fraley would be comfortable and not aware of double vision in most fields of gaze with prisms added to his glasses. He said that he did not know how long Fraley had had double vision nor did he know what caused it. He referred to the diplopia as "unexplained".

In response to questions from the Administrative Law Judge, Dr. Levy further testified, as follows:

I would think in Mr. Fraley's case, that he probably has controlled double vision relatively involuntarily over a long period of time. And then without knowing the reason why he became aware of his double vision and it became more and increasingly manifested.

And his awareness of it increased until the point at which he wore prisms. And then he was eased. And his visual mechanism responded and his brain then did not make him voluntarily aware of it as a problem.

Dr. Habeeb further testified:

Q. Would that [the accidental fall] be the type of injury, in your opinion, that *could* cause double vision?

A. I would think yes.

Dr. Azar testified at the hearing before the Administrative Law Judge. He con-

firmed the contents of his original report. He was asked if the double vision in Mr. Fraley's case would be caused by some sort of trauma. He responded that concussion may cause double vision but that "It does not cause this particular type of diplopia", that Fraley's problems were "developmental".

On questions from the Administrative Law Judge, Dr. Azar testified that "[I]f the concussion is severe enough and damages one of the nerves to the ocular, double vision might ensue"; that it is possible for a traumatic condition or a trauma to trigger something that will cause this double vision to become evident; that the fall from the scaffold as described could cause diplopia, but that in Mr. Fraley's case the fall did not cause it. Dr. Azar further said that paralysis of the face would be caused by the fifth cranial nerve, which would not affect vision.

Mr. Fraley testified at the hearing. He described the accident. He went back to work in September, 1972. He said that when he went back he had numbness in the face, headaches and dizziness. He had to "watch where I was looking and everything else when I was walking, when I was working on the scaffold, I was afraid of the heights. I was afraid because I couldn't see right, and it just kept getting worse."

Fraley resigned his employment on October 25, 1973. After being examined by Dr. Habeeb on June 13, 1974, he was not fitted with the prescribed glasses until late January, 1975. The new lenses solved the double vision problem. Fraley testified at the hearing that his eyesight had improved "tremendously" and that Dr. Habeeb had done "a wonderful job".

Todd hired Fraley back, but did not restore his eighteen years' seniority, pointing to provisions in its contract with the union which provided that an employee loses his seniority if he (1) quits voluntarily, or (2) does not present himself for work for a period longer than four consecutive straight time days and fails to sign an "appearance slip" (unless he is on an approved leave of

absence). Since work is assigned on a daily basis of seniority at the "shape-up", and since business was not exactly booming at Todd Shipyards at that time, Fraley was hired infrequently. After showing up at least three times a week for three consecutive weeks, Fraley again quit.

Fraley testified that he had not suffered from double vision prior to the accident.

In several pages of reported questions propounded by the Administrative Law Judge, Fraley declined to say positively that he had told Dr. Vogel of his vision problems in December, 1972. He never pinpointed the date when he first began to see double, following the accident.

### The Findings of the Administrative Law Judge

From the foregoing, it is seen that while Doctors Azar and Habeeb conceded that concussion can cause diplopia, they were of the opinion that Fraley's diplopia was not caused by trauma. It was caused by the imbalance in his eyes; it was developmental. No doctor gave it as his opinion that the accidental fall caused the diplopia. Dr. Hindelang did testify that Fraley had a "little diplopia" after 1967. Fraley did not complain of double vision when he went to see Dr. Vogel in December, 1972.

Fraley, and Fraley alone, testified to the presence of diplopia following the accident. He did not refer to it as double vision; he merely said that he "could not see right". He never stated *exactly when* the double vision started, following the accident, and nobody tried to ascertain that fact.

In the face of these facts, the Administrative Law Judge rendered the following, rather enigmatic

### Opinion

It is the opinion of the Presiding Officer that Claimant's diplopia was caused by the accident, and an appropriate compensation order will be entered.

In concluding that the diplopia was caused by the accident the Presiding Officer is relying upon the testimony of both Dr. Azar and Dr. Habeeb who were in agreement that the kind of trauma sustained by Claimant could cause the double vision; the testimony of Dr. Hinderberg [sic], Claimant's optometrist since 1967—five years before the accident— that Claimant had no diplopia prior to the accident; and the testimony of Claimant himself which was uncontradicted to the same effect. In addition, the testimony of Dr. Habeeb as to his finding of diplopia in June 1974 is accepted on the conclusion of Dr. Azar as expressed in his report of May 1, 1973 that he found no visual disability attributable to the injury of June 1972. Claimant will be found to be temporarily totally disabled.

While it is true that both Doctors Azar and Habeeb stated that the kind of trauma sustained by Fraley could cause double vision, Dr. Azar emphatically stated his opinion that the accident had not caused it. The record reflects the undisputed physical facts and medical considerations upon which he based that opinion. While Dr. Habeeb did not specifically offer the opinion that the accident did not cause the diplopia he did say what caused it, which did not involve the fall from the scaffold. The Administrative Law Judge made no finding as to whether he considered this evidence credible or incredible; he assigns no reason for rejecting it, particularly that part of Dr. Azar's report and testimony which stated undisputed scientific, physical reasons which ordinarily cause diplopia by reason of eye imbalance. He ignored Dr. Habeeb's testimony that Fraley had probably involuntarily controlled double vision over a long period of time and then "without knowing the reason why became aware of it". The Law Judge made no reference to the testimony of Dr. Hindelang that Fraley had had a little diplopia since 1967. He made no findings with reference to the failure of Fraley to complain of double vision when he was seen by Dr. Vogel in December, 1972, nearly six months after the accident. He makes no mention of the fact that the record is silent as to how quickly diplopia occurs after the type of traumatic impact encountered here.

What it all comes down to is that, vague and indefinite as it appears to have been, he accepted the testimony of Mr. Fraley, without appraising the record as a whole.

The Administrative Law Judge ordered that Fraley be paid in a lump sum for the period between the accident and the date of the order (reduced by amounts already paid) and in weekly payments "until further ordered".

### Board Action

On appeal, the Benefits Review Board recognized that the testimony of the ophthalmologists "raises a doubt as to whether claimant's diplopia was caused by the fall he sustained during the course of his employment", but held that factual doubts are to be resolved in favor of the employee or his dependent family, citing *Friend v. Britton,* 1955, 95 U.S.App.D.C. 139, 141, 220 F.2d 820, 821. Consequently, the Board held that the record supported the finding that Fraley's disability arose out of and in the course of his employment.

The Board, however, disagreed with the Administrative Law Judge as to the length of Fraley's disability and held that the record did not support temporary total disability beyond the time that Fraley was fitted with the new prism lenses, January 30, 1975. Upon a motion for reconsideration the Board, by a two to one vote, reversed itself because, it said, Fraley's *low seniority* upon reinstatement prevented him from getting any jobs.

This appeal followed.

In November, 1978, the month before this case was orally argued, the petitioners offered to rehire Fraley with his old seniority and they paid him $12,910. Fraley cashed the check, but disputed the amount;[1] he accepted the job offer and went back to work November 15, 1978. Ten days later

he broke his foot at home and was again unable to work.

### The Standard of Review

In reviewing a decision of the Commissioner and in applying the substantial evidence rule, the reviewing court must take into account that the standard of persuasion is less before the Commissioner than it would be in a jury trial of the same issue. This is because Congress has indicated an intention to require less. The policy of the Act that all doubtful questions are to be resolved in favor of the longshoreman is to be considered in determining whether there was substantial evidence before the Commissioner. Having taken this into account, the reviewing court applies the same rule to *review* of administrative proceedings that an appellate court applies to review of jury verdicts, and, in this respect, as we said in *Watson, (Watson v. Gulf Stevedore Corp.,* 5 Cir., 400 F.2d 649), the *scope of review* of jury verdicts and of administrative findings is the same. It is a non sequitur to suggest that the same standards must apply to determine the burden of persuasion before the trier of fact as those applicable when an appellate court reviews the record.

*Young and Co. v. Shea,* 5 Cir. 1968, 404 F.2d 1059, 1061–62 (Joint Panel opinion), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1771, 23 L.Ed.2d 237 (footnotes omitted).

From the standpoint of factual analysis, this case is quite like *Goins v. Noble Drilling Corporation,* 5 Cir. 1968, 397 F.2d 392. The issue there was whether the claimant was physically able to return to his previous employment. The claimant testified in person. There were written medical reports from eleven doctors who had examined and treated him. Six of the doctors had been

1. If this were an ordinary case, it might well be moot at this point. 33 U.S.C. § 921(c) requires the payment of the amounts awarded by the Benefits Review Board unless the court orders a stay, which can be granted only if irreparable injury would ensue to the employer or carrier. No stay has been granted, and the petitioners were therefore obligated to pay. In addition, they have not attacked the procedure established by the statute. In view of our decision that Fraley was not entitled to receive the entire amount awarded by the Benefits Review Board, he must return part of it, and, if he fails to do so, the petitioners may institute a separate action to recover such moneys.

provided by the employer; five had been recommended by the claimant's attorneys. Nine of the eleven doctors concluded that the claimant was in good physical condition. Two doctors submitted reports that told of pain and discomfort suffered by Goins but neither report contained definite statements that Goins could not or should not return to his former employment. The Deputy Commissioner found that the claimant had been unable to return to work and awarded additional compensation. This Court pointed out that in a Longshoreman's Act case the findings of the Deputy Commissioner are to be accepted unless they are unsupported by substantial evidence on the record considered as a whole. More specifically, we held that appellate review is not to be a mere rubber-stamping of the order when the reviewing court is unable to conscientiously conclude that substantial evidence supported the decision.

If there were no other course open to us, in light of the discussion appearing heretofore in this opinion, we would be compelled to hold that there is no substantial support in the record as a whole that Fraley's diplopia was caused by the accident of June 27, 1972.

As already pointed out, however, there are big gaps in both the evidence and the findings of the Administrative Law Judge. The findings do not adequately treat with the record, considered as a whole. We think the record should be further developed on the testimony of Dr. Hindelang as to whether or not, in fact, he diagnosed diplopia in Mr. Fraley prior to the time of the accident in question. Mr. Fraley should be required to state specifically when he first noticed diplopia subsequent to the accident. Expert testimony should be heard as to how quickly diplopia ordinarily appears following trauma of the type experienced in this case. In his future findings the Administrative Law Judge should evaluate the expert opinions of Dr. Azar and Dr. Habeeb, elucidating upon his reasons for rejecting that testimony if, indeed, he does reject it. A remand is in order, *see, e. g., Perkins v. Coal Operators Casualty Company*, 5 Cir. 1965, 353 F.2d 784; *Gulfport Ship*

*Building Corporation v. Vallot*, 5 Cir. 1964, 334 F.2d 358, *cert. denied*, 380 U.S. 974, 85 S.Ct. 1333, 14 L.Ed.2d 269; *Sea-Land Service, Inc. v. Director*, 3 Cir. 1977, 552 F.2d 985; *Duluth, Missabe and Iron Range Railway Co. v. U. S. Dept. of Labor, et al.*, 8 Cir. 1977, 553 F.2d 1144.

The result of such a remand should be the compilation of a complete evidentiary record and adequate findings, upon which there can be a satisfactory review under the substantial evidence test.

### The Payment of Benefits After January 31, 1975

We do not remand that part of the case dealing with the payment of benefits after January 31, 1975. On this point we reverse the Board decision.

Section 2(10) of the Act defines "disability" as an

incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment.

33 U.S.C. § 902(10). The Act does not provide further definitions of, nor a standard by which to judge, what constitutes a "total", as opposed to a "partial" disability. Our cases, however, have consistently treated "total" disability as

a complete incapacity to earn wages in the same or any other employment. The use of the words "in the same or any other employment" presupposes a situation where a man can secure employment.

*Godfrey v. Henderson*, 5 Cir. 1955, 222 F.2d 845, 849 (quoting *Eastern S.S. Lines, Inc. v. Monahan*, 1 Cir. 1940, 110 F.2d 840, 842); *Diamond M. Drilling Co. v. Marshall*, 5 Cir. 1978, 577 F.2d 1003. We have also recognized that "[t]he concept of 'total disability' is economic as well as medical." *Watson v. Gulf Stevedore Corp.*, 5 Cir. 1968, 400 F.2d 649, 654 (quoting *Quick v. Martin*, 1968, 130 U.S.App.D.C. 83, 85, 397 F.2d 644, 648), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969). Consequently, "[t]he degree of disability in any case cannot be

measured by physical condition alone, but there must be taken into consideration the injured man's age, his industrial history, his mentality, his education, and the availability of that type of work which he can do." *Godfrey v. Henderson, supra,* 222 F.2d at 849; *Cunnyngham v. Donovan,* 5 Cir. 1964, 328 F.2d 694, 697; *Watson v. Gulf Stevedore Corp., supra,* 400 F.2d at 653; *Diamond M. Drilling Co. v. Marshall, supra,* 577 F.2d at 1005–06.

In the case now before us, there was absolutely no evidence presented upon which the Benefits Review Board could have based its conclusion that Fraley had a continuing temporary total disability. At the time of the accident, Fraley was forty-nine years old, and he had eighteen years of seniority with Todd Shipyards. There was no other evidence on whether other jobs similar to that which he performed were available with other companies, nor was there any useful evidence concerning the availability of jobs at Todd, other than Fraley's testimony that he had not been hired from the shape-up for several weeks due to his lack of seniority.

 Instead of focusing on the question of whether Fraley was totally disabled, in accordance with the judicial gloss which our cases have placed on the statute, the Benefits Review Board apparently pursued a causation analysis. According to the Board, at least implicitly, the accident caused the diplopia, Fraley resigned rather than continue on sick leave, he cannot return to his former job because of the loss of his seniority, and he is entitled to a continuation of his benefits. We reject this analysis. The inquiry is not whether Fraley could return to the identical job which he had at the time of the accident. There are many cases in which an employee is injured and requires a long period of convalescence. In the interim, his employer must replace him with another worker, and, when he recovers, the injured employee may find that his old job is not available, either because it has been eliminated or has been filled. The Act does not require that an injured employee who recovers must be re-stored to his old job. It uses the term "in the same or any other employment". 33 U.S.C. § 902(10). Therefore, the Board incorrectly analyzed the question. Since the record does not contain substantial evidence to support the conclusion of continuing temporary total disability, the Board's award of compensation payments must be reversed insofar as it requires Todd and Travelers to make payments to Fraley for a disability which continued after the date of January 30, 1975.

In the circumstances of this case, it is not inappropriate for us to add a few words to emphasize what we do not hold. Although it may seem harsh to allow Todd to deny Fraley the restoration of eighteen years of seniority, the literal terms of the collective bargaining agreement required it. However, his seniority was afterwards restored, whereupon Fraley suffered a broken foot at home and could not return to work. The Union certainly has an interest in insuring that an employer complies with the collective bargaining agreement, and all of its members are vitally concerned with seniority. Fraley, however, resigned his job because he was on leave without pay, thereby relinquishing his seniority.

 Todd cannot be entirely faulted in the harsh manner advocated by the Administrative Law Judge. Five different doctors, whose credentials have not been questioned, examined Fraley and were either unable to find a problem with his vision or to prescribe a solution to a problem which they did find. This does not seem to be a case in which a company doctor performs a perfunctory, superficial examination and then concludes that the worker is malingering and can return to work. The statutory requirement that the employer furnish such medical treatment "for such period as the nature of the injury or the process of recovery may require," 33 U.S.C. § 907(a), simply cannot mean that an employer is required to send a worker who claims to be injured to every qualified doctor who can be found when a succession of doctors fails to find a medical problem.

We simply hold that the finding of a continuing temporary total disability beyond January 31, 1975, is unsupported by substantial evidence on the record considered as a whole.

Of course, if it should be determined after appropriate proceedings on remand that Fraley's diplopia was not caused by the accidental fall, that will settle the matter of compensation for all periods at issue.

### Attorney Fees

We leave this question to abide the future outcome of the case.

### Conclusion

The decision of the Review Board as to whether Fraley's diplopia was caused by the accident of January 31, 1972 is vacated, and remanded for further proceedings not inconsistent herewith.

The Board's decision as to benefits payable after January 31, 1975 is reversed.

VACATED and REMANDED IN PART; REVERSED IN PART.